Johnnie J. JOHNSON, Barbara Ann Johnson, William L. Mance, Mary L. Mance, John Mance, Waralene Hopkins, and all other persons similarly situated, Plaintiffs,

v.

FLEET FINANCE, INC., Fleet Finance Inc. of Georgia, Tower Financial Services, Inc., Mortgage Equity Services and Donetta Lowe, d/b/a Lowe & Associates, Defendants.

No. CV 191–121.

United States District Court, S.D. Georgia, Augusta Division.

Feb. 21, 1992.

Stephen E. Shepard, Larry Ira Smith, Thomas Reuben Burnside, Jr., Harry Duff Revell, James Barnard Wall, Burnside, Wall, Daniel & Ellison, James Marion Thompson, Augusta, Ga., for plaintiffs.

W. Rhett Tanner, Atlanta, Ga., William Augustus Trotter, III, Robert C. Hagler, Fulcher, Hagler, Reed, Hanks & Harper, Augusta, Ga., Hugh W. Gibert, Atlanta, Ga., Benjamin F. McElreath, Augusta, Ga., for defendants.

## ORDER

EDENFIELD, Chief Judge.

This case concerns the lending practices of the Defendant corporations. The Plaintiffs allege that these practices violate Georgia's usury law, O.C.G.A. § 7–4–18 (1989); Georgia's RICO Act ("Georgia RICO"), O.C.G.A. § 16–14–1 *et seq.* (1988 & Supp.1991); the Federal Racketeer Influenced and Corrupt Organizations Statute ("RICO"), 18 U.S.C. § 1961 *et seq.* (1988); and the Truth–In–Lending Act ("TILA"), 15 U.S.C. § 1640 (1988). Defendants Fleet

Finance, Inc., Fleet Finance Inc. of Georgia (collectively "Fleet"), and Tower Financial Services, Inc. ("Tower"), have moved to dismiss the Plaintiffs' complaint, as amended, for failure to state a claim.

In a Report and Recommendation, Magistrate Judge Dunsmore recommends that the Court deny the motion to dismiss the state usury claims. The Magistrate Judge also recommends that the Court deny the motion to dismiss the RICO claims, but require the Plaintiffs to amend the complaint to allege their injury more particularly. Finally, the Magistrate Judge recommends that the Court dismiss claim 7 of the TILA count, but deny the motion to dismiss the remaining TILA claims, insofar as those claims relate to brokerage fees. The Report does not address the Georgia RICO count.

After conducting a thorough de novo review of the record, the Court disagrees with many of the Magistrate Judge's conclusions of law. The Court GRANTS the Defendants' motions to dismiss the claims under Georgia usury law, Georgia RICO, and the federal RICO act. The Court GRANTS Fleet's motion to dismiss the TILA claims in their entirety. Tower's motion to dismiss the TILA claims is also GRANTED, with one minor exception. The Court DENIES Tower's motion to dismiss the portion of the TILA claim that concerns brokerage fees. Moreover, the Court DISMISSES the complaint against Defendants Lowe and Mortgage Equity. Although Lowe and Mortgage Equity did not join the other Defendants' motions to dismiss, the complaint fails to state a claim for relief against them for the same reasons it fails to state a claim against Tower and Fleet.

## BACKGROUND

This case arises out of loan transactions between the Plaintiffs and Defendant Tower. Plaintiff Waralene Hopkins obtained her second mortgage loan by appearing in person at Independent Mortgage in Augusta, Georgia. Independent Mortgage served as a loan broker for Tower. The Johnsons and Mances, also Plaintiffs in this case, took out second mortgage loans on their homes in response to newspaper advertisements offering residential mortgage loans. Defendants Donetta Lowe d/b/a Lowe & Associates ("Lowe") and Mortgage Equity Services ("Mortgage Equity") had placed these advertisements in various newspapers in order to attract borrowers. Lowe and Mortgage Equity, as loan brokers for Tower, obtained loans for the Johnsons and Mances. Defendant Fleet, which customarily purchases financing agreements on the secondary market from entities such as Defendant Tower, later purchased the Johnson and Mance loans from Tower.

The loan transactions between the Plaintiffs and Tower contained similar terms. Fees to the mortgage broker and discount points charged amounted to almost twenty percent of the principal amount of the note. These fees were nonrefundable, and they were not subject to a rebate if the loans were prepaid. The Plaintiffs were not permitted to make partial prepayments of principal or interest. The loan contracts provided that any prepayment of the loan would be subject to prepayment penalties.

## ANALYSIS

### I. *Failure to State a Claim for Relief*

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a complaint on the ground that the plaintiff has failed to state a claim upon which relief can be granted. A motion under Rule 12(b)(6) attacks the legal sufficiency of the complaint. In essence, the movant says, "Even if everything you allege is true, the law affords you no relief." Consequently, in determining the merits of a 12(b)(6) motion, a court must assume that all of the factual allegations of the complaint are true, *e.g., United States v. Gaubert,* —— U.S. ——, 111 S.Ct. 1267, 1276, 113 L.Ed.2d 335 (1991); *Powell v. Lennon,* 914 F.2d 1459, 1463 (11th Cir. 1990), and construe them in the light most favorable to the plaintiff. *E.g., Sofarelli v. Pinellas County,* 931 F.2d 718, 721 (11th Cir.1991). "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts consist-

ent with the allegations." *Hishon v. King & Spaulding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (citation omitted); *see Bank v. Pitt,* 928 F.2d 1108, 1111–12 (11th Cir.1991) (per curiam). "Where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice." *Bank,* 928 F.2d at 1112 (footnote omitted).

## II. *State Usury Claims*

The Plaintiffs allege that the Defendants' loan practices are usurious, in violation of O.C.G.A. § 7–4–18, which provides:

> Any person, company or corporation who shall reserve, charge or take for any loan or advance of money, or forbearance to enforce the collection of any sum of money, any rate of interest *greater than five percent per month,* either directly or indirectly, by way of commission for advances, discount, exchange or the purchase of salary or wages; by notarial or other fees; or by any contract, contrivance, or other device whatsoever shall be guilty of a misdemeanor....

O.C.G.A. § 7–4–18 (1989) (emphasis added). The Plaintiffs do not contend that the annual interest charged on the loans exceeds an average of five percent per month. Instead, they claim that nonrefundable discount points and other initial charges, added to the interest charges accrued during the first month of the loan, exceed five percent.

■ Although the Defendants disagree with the Plaintiffs' characterization of some initial charges as "interest," they concede that they did charge more than five percent of the principal, in the form of discount points and other interest charges, during the first month of the loan. They argue, however, that these charges should be amortized over the life of the loan to calculate what interest rate was charged "per month." The Court agrees.

### A. Amortization under *Norris*

■ To decide whether discount points and other initial charges should be amor-

tized over the life of the loan, the Court must determine what the Georgia legislature meant by "any rate of interest greater than five percent per month." The proper interpretation of an issue of state law is a question of state law. Therefore, federal courts sitting in diversity are required to construe the law as the Supreme Court of the state would. *Royal Health Care Services, Inc. v. Jefferson–Pilot Life Ins. Co.,* 924 F.2d 215, 216 (11th Cir.1991); *Madara v. Hall,* 916 F.2d 1510, 1514 (11th Cir.1990). If the state's highest court has addressed an issue of state law, then any federal court sitting in diversity must follow the decision of the state court. *Flintkote Co. v. Dravo Corp.,* 678 F.2d 942, 945 (11th Cir.1982) (citations omitted). This principle is true even if the Georgia Supreme Court's decision directing the federal court is nothing more than an affirmance without opinion of a court of appeals decision. *Silverstein v. Gwinnett Hosp. Auth.,* 861 F.2d 1560, 1569 (11th Cir.1988). Moreover, a federal court sitting in diversity must follow all of the Georgia Supreme Court's statements of law, even those expressed in dicta, because the diversity court is bound to decide the case the way the Georgia Supreme Court would decide it. *Towne Realty, Inc. v. Safeco Ins. Co. of America,* 854 F.2d 1264, 1269 n. 5 (11th Cir.1988) ("when considering a diversity case under state law, we are bound to decide the case the way it appears the state's highest court would, and we would be violating that duty to ignore the fact that this statement [of dicta] was made.").

The Georgia Supreme Court has recently interpreted O.C.G.A. § 7–4–18 (1989), in *Norris v. Sigler Daisy Corporation,* 260 Ga. 271, 392 S.E.2d 242 (1990). To calculate the interest rate charged by a lender, the court subtracted the principal amount from the total of all payments due during the life of the loan, and then divided that difference by the number of months of the loan. From this calculation the court derived "the amount of simple interest attributable to each month." *Id.* at 273, 392 S.E.2d 242. After dividing the monthly interest by the principal amount of the

loan, the court discovered that the monthly interest rate was 5.99%, higher than the rate permitted under Georgia's criminal usury statute. *Id.* Thus, the loans in *Norris* were usurious.

The Defendants argue, and the Court agrees, that courts must amortize all interest charges, including discount points, over the life of a loan to ascertain whether a loan is usurious. The *Norris* court rejected the argument that the Annual Percentage Rate of 59.83%, shown on the disclosure form, conclusively established that the loan did not violate § 7–4–18. Instead, the court explained that usury should be measured in terms of simple interest. *Id.* at 273, 392 S.E.2d 242. Without analyzing the calculations by which the lender arrived at the 59.83% figure, the court stated: "that rate is clearly not *simple interest by which usury is measured ...*" *Id.* at 273, 392 S.E.2d 242 (emphasis added). Then, the court referred to the civil usury statute, O.C.G.A. § 7–4–2 (1989), which explicitly states that usury is measured in terms of simple interest. From this reference, this Court infers that cases which calculate usury under the civil usury statute provide guidance for this Court's calculation of usury under the criminal statute.

As amended in 1983, O.C.G.A. § 7–4–2 limits the "simple interest" that a lender may charge for loans of under $3,000 to 16% per annum, but the code section does not specify how a court should calculate a loan's rate of interest in order to determine whether the loan is usurious. The predecessor to Georgia's modern civil usury statute, however, provided:

> The rate of interest applicable to a real estate loan shall be computed upon the assumption that the debt will be paid according to the agreed terms and will not be paid before the end of the agreed term. Any sums of money reserved or taken for the loan or forbearance which are in the nature of and taken into account in the calculation of interest, *even though paid at one time, shall be spread over the stated term of the loan for the purpose of determining the rate of interest under this section.*

Ga.Code Ann. 57–101.1(c)(7) (1979) (repealed) (emphasis added). *See Scheil v. Georgia Fed'l Sav. & Loan Ass'n,* 154 Ga.App. 714, 714–15, 269 S.E.2d 881 (1980) (discussing this former Code section). How the interest is "spread," or amortized, over the life of the loan varies according to the type of loan. The Georgia Supreme Court has explained that regular amortization, that is, the calculation used in *Norris,* is appropriate in most cases, but "it is an inappropriate measure for determining usury in the case of irregularly amortized loans, 'balloon' payment loans, or interest only loans because it fails to take into account the actual outstanding principal balance. We adhere to the actual declining-principal balance method...." *Southern Fed. Sav. & Loan Ass'n v. Lyle,* 249 Ga. 284, 288–89, 290 S.E.2d 455 (1982) (decided under former Georgia Code civil usury statute). Nevertheless, these cases establish that courts should amortize, in some fashion, all interest charges in order to determine if a loan is usurious.

The Plaintiffs argue that amortizing discount points over the *potential* life of a loan ignores the possibility that the loan will be repaid before the end of the term. For the Plaintiffs' loans, prepayment could make the combination of discount points, ordinary interest, and prepayment penalties exceed an average of five percent per month. This possibility, contend the Plaintiffs, renders the loans usurious on their face. The Plaintiffs' position is not, however, the law of Georgia. In *Adamson v. Lilienthal,* 77 Ga.App. 392, 48 S.E.2d 579 (1948), the Georgia Court of Appeals considered whether a loan that would have been free from usury if paid according to the terms of the contract could become usurious if the borrower voluntarily repaid the loan before its maturity. Because of the early repayment, the lender in *Adamson* received more in the aggregate than the sum of the principal and the maximum legal rate of interest computed to the date of payment. Nevertheless, the court held that the loan was not usurious. *Id.* Although *Adamson* was decided under Georgia's civil usury statute, and this case alleges a violation of the criminal statute,

there is no reason to believe that the Georgia Supreme Court would distinguish *Adamson* from this case. The loans in this case are not usurious, despite the possibility of early prepayment.

### B. Moral Outrage

The Magistrate Judge recommends that the Court decide whether the loan is usurious without amortizing the interest charges over the life of the loan:

> Finding that discount points are interest, rather than a fee for services rendered, and further that these fees were non-rebatable, the Court is to determine if the combination of simple interest of the amount financed during the first month of the loan and the non-rebatable loan fee results in a total interest charge in the first month of the loan in excess of five percent. *Moore v. Comfed Savings Bank*, 908 F.2d [834, 842 (11th Cir.1990).] Inasmuch as this "loan fee" accrued immediately and was non-refundable, the charge must be considered as interest applicable exclusively to the first month of the loan.

(Report & Recommendation at 19.) If the Court adopts this method of calculation, then the Defendants' motion to dismiss the usury count must be denied because, as the Defendants concede, the Plaintiffs' loans charged interest, including discount points, during the first month in excess of five percent.

Magistrate Judge Dunsmore is not the first federal judge to find this approach appealing. Recently, Judge John Dalis of the United States Bankruptcy Court adopted this analysis in two separate cases. *See Dent v. Associates Equity Serv. Co.*, 130 B.R. 623 (Bankr.S.D.Ga.1991); *Evans v. Avco Financial Service of Georgia, Inc.*, 130 B.R. 357 (Bankr.S.D.Ga.1991). Judge Dalis rejected the argument that he should amortize discount points, along with other interest charges, over the life of the loan to arrive at an average monthly interest rate, commenting that

> Permitting a lender to charge nonrefundable fees upon the execution of the loan, yet amortize the charges over the life of the loan in order to come within a perceived sixty (60%) percent per annum interest limitation (5% per month × 12 mos.), is inherently unfair to the borrower and inconsistent with the purpose of the statute.

*Evans*, 130 B.R. at 360. Thus, Judge Dalis implied that any "inherently unfair" interest rate, or method of determining that interest rate, is obviously inconsistent with the purpose of Georgia's criminal usury statute. The Court disagrees.

Contrary to Judge Dalis' suggestion, Georgia's criminal usury statute is not designed to set fair interest rates on loans. For many years, Georgia's civil usury statute set an arbitrary limit on permissible interest rates in order to provide a "check on the conscience of the lender." *Green v. Equitable Mortgage Co.*, 107 Ga. 536, 540, 33 S.E. 869 (1899). The criminal usury statute was designed merely to enhance the civil penalties in only the most egregious cases, those in which the lender charged more than five percent interest per month. *Wall v. Lewis*, 192 Ga. 652, 653, 16 S.E.2d 430, 431 (1941). Today, the civil usury statute sets no limits on interest rates for loans of more than $3,000, and the criminal usury statute continues to apply only to the most egregious lending practices. A loan with a simple interest rate of 59% per annum may strike many, including this Court, as unfair to borrowers, such as the Plaintiffs, who pledge real property as security for a loan. Georgia law does not, however, prohibit such a loan. The legislature has decided to permit borrowers to choose, without interference from the law, whether to accept such loan terms.

Judge Dalis and Magistrate Judge Dunsmore find precedent for their method of calculation in a case strikingly similar to this one, decided by Judge Bowen of this District, *Moore v. Comfed Sav. Bank*, 777 F.Supp. 960 (S.D.Ga.1991). In *Moore*, Judge Bowen explained that he adopted this approach instead of the approach used in *Norris* because the defendant's loans "contained such exorbitant charges and were of such an unconventional nature as

to be subject to enhanced scrutiny." *Id.* at 961.

Several judges on the Eleventh Circuit share Judge Bowen's outrage at the practice of charging high discount points on loans. In an appeal of Judge Bowen's earlier denial of summary judgment for the defendants in *Moore,* Judge Tuttle, writing for a panel of the Eleventh Circuit, recognized that

> it is within the province of the state legislature to determine what interest rates may become usurious. The State of Georgia has, by enacting Section 7-4-2(a)(3), [part of the current civil usury statute], apparently left the door wide open for any lender to charge any rate of interest on a loan secured by real estate that may be agreed to by the borrower.... [T]he criminal statute, Section 7-4-18, does, however, put a restriction on the amount of interest chargeable to five percent per month, or 60 percent per annum.

*Moore v. Comfed Sav. Bank,* 908 F.2d 834, 841 (11th Cir.1990). Thus, the court acknowledged that only the state legislature, not federal courts, should be permitted to limit the interest rates or discount points lenders may charge. Nevertheless, the court expressed its moral outrage at the rates charged by the defendants in that case:

> We consider these annual percentage rates to be "outrageous" in light of the figures shown in the "Statistical Abstract of the U.S. 1989...." This abstract showed that, as contrasted with the "points" charged here, ranging from 20 to 38, the "initial fees" in the year 1984 averaged 2.54 percent and in 1985 2.5 percent. At the same time, the average interest rate on residential mortgages for 1984 was 12.0 and in 1985 11.1 percent.

*Id.* at 841 (footnote omitted). The court affirmed the district court's denial of the defendants' summary judgment motion, noting that the law "intends that a search for usury shall penetrate to the substance." *Id.* at 842 (quoting *Pope v. Marshall,* 78 Ga. 635, 4 S.E. 116 (1887)).[1]

The comments of these federal courts reflect the courts' moral determination that loan contracts with large initiation fees, in the form of unrebatable discount points, are intolerable. In their attempt to "penetrate to the substance" of these lending practices, however, the courts forget that it is the state legislature which must determine what interest rates are illegal. After setting strict limits on interest rates for many years through the civil usury statute, Georgia decided in the early 1980s that, for the most part, the law will not extricate borrowers from their poor bargains.[2] Currently, the civil usury statute sets no limitation on loans of more than $3000. O.C.G.A. § 7-4-2. The criminal usury statute, designed to punish only the most egregious lending practices, should not be manipulated to thwart the intentions of the legislature.

## C. Strict Construction of Criminal Statutes

Although this suit is a civil action, the Plaintiffs' usury claim is based upon a

---

1. The Georgia Supreme Court decided *Norris* while *Moore* was pending. *Moore,* 908 F.2d at 840 n. 2. Apparently the parties did not argue the *Norris* method of calculation to the District Court, although the defendants submitted a brief on the issue to the Eleventh Circuit after the appeal. (Tower's Objections to Mag.'s R & R at 13 n. 5.) Nevertheless, the Eleventh Circuit did not discuss the *Norris* method of calculation. Thus, it is inaccurate to say that the Eleventh Circuit rejected the argument that *Norris* is the exclusive method of calculating interest for purposes of deciding whether a loan is usurious. The Eleventh Circuit never considered the issue, perhaps because it was not briefed in the trial court.

2. Previously, legislators believed that usury laws served a moral purpose: to prevent greedy lenders from squeezing too much from poor, unsuspecting consumers. By the 1980s, the prime lending rate increased to previously unknown levels—exceeding 20%. With those market realities, banks and other lenders could not afford to lend money to consumers in Georgia without running afoul of the usury laws. Many chose not to lend at all. Thus, the usury laws no longer protected borrowers. The Georgia legislature recognized that their attempts to protect the consumer were misguided. With this new reality in mind, the legislature repealed those civil usury laws that were on the books at the time.

criminal law, O.C.G.A. § 7–4–18 (1989). As a criminal statute, the law "must be strictly construed against the state." *Mitchell v. State,* 239 Ga. 3, 3, 235 S.E.2d 509 (1977); *Glisson v. State,* 188 Ga.App. 152, 153, 372 S.E.2d 462 (1988). Criminal laws should be "plain and unambiguous and not dependent upon the current conflicting views of ... judges." *Mitchell,* 239 Ga. at 3, 235 S.E.2d 509. Because the criminal usury statute must be strictly construed, this Court will follow *Norris,* which interpreted this statute based on previously established Georgia law and the language of the statute itself.

█ The *Norris* court's interpretation of this statute is consistent with its plain, ordinary meaning. O.C.G.A. § 7–4–18 prohibits loans with interest rates in excess of five percent "per month." It does not forbid a lender from collecting or accruing the right to collect more than five percent interest "in any month." The phrase "per month" implies an average. If a long distance runner completes the first mile of a marathon in five minutes, one should not assume that she will run the entire marathon at a pace of five minutes per mile. Her average may be slower or faster. The phrase "per mile" should reflect her average speed for the entire marathon. By using the expression "per month," the Georgia legislature unambiguously declared that usury is measured by determining what interest rate is charged, *on average,* in a month. To assume that a loan is usurious because more than five percent is charged during the first month is akin to assuming that the marathon runner who runs the first mile in five minutes will run the entire marathon at that pace.

Georgia's criminal usury statute is violated only if a lender charges more than five percent interest per month, as calculated by amortizing all interest charges over the potential life of the loan. As the Plaintiffs concede, the Defendants did not charge more than an average of five percent interest per month. Accordingly, the Plaintiffs' claim under Georgia's usury statute fails. The Defendants' motions to dismiss this claim are GRANTED.

### III. *Federal and State RICO Claims*

In addition to asserting claims under Georgia's usury statute, the Plaintiffs claim that the Defendants' lending practices violated the state and federal RICO statutes. Under the federal RICO statute, it is "unlawful for any person through a pattern of racketeering activity or through collection of any unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(c) (1988). As Magistrate Judge Dunsmore explained, a federal RICO cause of action must allege that the enterprise is engaged in a pattern of racketeering activity or that the enterprise is engaged in the collection of an unlawful debt. (Report & Recommendation at 4.) In this case, the Plaintiffs allege wire and mail fraud as a "pattern of racketeering activity" and allege the collection of an unlawful debt. A closer reading of the complaint reveals that the thrust of the Plaintiffs' argument is that the Defendants' efforts to make loans and collect the debt created by these loans constitutes a "pattern of racketeering activity." As explained above, the Defendants' loans were not usurious. The Plaintiffs' allegations dissolve into nothing more than allegations that the Defendants engaged in *lawful* lending practices. These practices do not constitute "racketeering activity" for which the Plaintiffs may recover civil damages. The Defendants' motions to dismiss the federal RICO claims are GRANTED.

The Georgia legislature enacted the Georgia RICO Act, O.C.G.A. § 16–14–1 *et seq.* (1988 & Supp.1991), after the federal RICO Act and used substantially the same language as the federal act. Like the federal act, Georgia RICO proscribes certain predicate acts and creates a civil remedy for any person injured by a pattern of the predicate acts. O.C.G.A. §§ 16–14–3, 16–14–4, 16–14–6; *see Chancey v. State,* 256 Ga. 415, 349 S.E.2d 717 (1986) (comparing Georgia RICO to the federal act), *cert. denied,* 481 U.S. 1029, 107 S.Ct. 1954, 95 L.Ed.2d 527 (1987). In this case, the al-

leged predicate acts are the Defendants' loan practices.[3] Because, as explained above, these loan practices are legal, the Plaintiffs' Georgia RICO claims fail. The Defendants' motions to dismiss the Georgia RICO claims are GRANTED.

## IV. *Truth–In–Lending Act Claims*

Two of the Plaintiffs, the Mances, allege that Defendants Tower and Fleet violated the Federal Truth–In–Lending Act ("TILA"), 15 U.S.C. § 1601–77 (1988). The other Plaintiffs do not assert any claims under TILA. Initially, the Mances alleged seven separate TILA violations, but, in response to the Defendants' motions to dismiss, the Mances withdrew two of these allegations. In his Report and Recommendation, the Magistrate Judge addressed the remaining five TILA allegations, recommending that the Court dismiss only one, the allegation that the Mances were not informed whether a subsequent purchaser could assume the original loan obligation.

The Court agrees with the Magistrate Judge's conclusion that the Defendants did not fail to inform the Mances whether the loan could be assumed by a subsequent purchaser. The Court ADOPTS the Magistrate Judge's analysis of this issue, *see* Report and Recommendation at 16, and GRANTS the Defendants' motions to dismiss this portion of the Plaintiffs' TILA claim.

■ The remaining four TILA allegations concern disclosure of the "amount financed." Specifically, the Mances allege that the disclosure statements violate TILA in the following ways:

(1) they fail to disclose properly the "amount financed";

(2) the "amount financed" in part consisted of finance charges;

(3) the "amount financed" was not properly itemized; and

(4) the "annual percentage rate" was not properly stated.

(Complaint, at ¶ 61(A)–(D).) The Mances allege that many items on the disclosure statement they received should have been included in the "finance charge" category rather than the "amount financed" category. As the Magistrate Judge determined, the amount given to the Mances directly, the amount paid to public officials, and all fees for title examination, abstract of title, title insurance, and closing costs were properly included in the "amount financed" category. (Report & Recommendation at 14–16 (construing Regulation Z, 12 C.F.R. § 226.4 (1991))). The Court adopts the Magistrate Judge's analysis of these issues, and GRANTS the Defendants' motions to dismiss this portion of the TILA claims.

■ Although the Magistrate Judge recommends granting the motions to dismiss the TILA claims in part, he recommends denying the Defendants' motion to dismiss the TILA claims concerning brokerage fees. The Plaintiffs contend that the amount paid to Lowe, the broker, should have been labelled a "finance charge" rather than part of the "amount financed" in the disclosure documents.

■ Regulation Z, promulgated by the Federal Reserve Board, governs this issue, and the official staff interpretations of that regulation, unless demonstrably irrational, are binding on this Court. *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22 (1980). The staff commentary indicates that "Charges imposed on the consumer by someone other than the creditor for services not required by the creditor are not finance charges, as long as the creditor does not retain the charges." Regulation Z, Supplement I–Official Staff Interpretations ("Commentary"), 12 C.F.R. § 226.-4(a)(3) (1991). As the Magistrate Judge found and the Plaintiffs concede, neither Tower nor Fleet retained the fees listed as paid to Lowe. The issue is whether the brokerage services were "required by the creditor," Tower.

---

**3.** Georgia RICO, unlike the federal act, does not explicitly prohibit "collection of an unlawful debt." *See* O.C.G.A. § 16–14–4 (1988). Never- theless, the Plaintiffs contend that the Defendants' lending practices are a predicate act, which they call "theft."

The Mances allege that Tower's informal practice is to require the services of a loan broker. Such a requirement was not apparent to the Mances, who contacted a broker first before obtaining the loan from Tower. Nevertheless, the Mances suggest that they complied with the requirement without realizing that it was a requirement. If so, then the brokerage fees should have been disclosed as part of the "finance charges." Although the pending motion is a motion to dismiss, not a summary judgment motion, the Mances offer some evidence that their claim supports this allegation. At Fleet's offices in Augusta, the Mances examined sixty-six files of loans in which Tower was the lender at closing and Fleet was the assignee of the loans. Of those sixty-six loans, sixty-four had loan brokers. (Pls.' Response to Defs.' Objections to Report & Recommendation.) The Mances suggest that this evidence raises an inference that Tower informally required borrowers to use a loan broker.

The Court is uncomfortable about permitting this claim to go forward because, as the Defendants suggest, it appears that the Plaintiffs are launching a fishing expedition. Nevertheless, the Court finds that the Mances have alleged a sufficient claim for relief under TILA to defeat this motion to dismiss. The Court DENIES Tower's motion to dismiss the Mances' TILA claim, to the extent that it relates to the brokerage fees.

The complaint does not, however, allege a sufficient claim against Fleet, the assignee of the Mance loan. As the Magistrate Judge noted, an assignee is liable for a TILA violation only when the violation is "apparent on the face of the disclosure statement." 15 U.S.C. § 1641(a) (1988). Obviously, any informal requirement of a loan broker was not "apparent on the face" of the Mances' disclosure document. Accordingly, the Court GRANTS Fleet's motion to dismiss all TILA claims against it.

### CONCLUSION

For the reasons explained above, the Court GRANTS Fleet's motion to dismiss the complaint in its entirety. Moreover, the Court DISMISSES the Plaintiffs' complaint against Defendants Lowe and Mortgage Equity. The Court also GRANTS Tower's motion to dismiss the Plaintiffs' claims under Georgia's usury statute, Georgia's RICO law, and the federal RICO statute.

Tower's motion to dismiss the TILA claims is also GRANTED, with one minor exception. The Court DENIES Tower's motion to dismiss the portion of the TILA claim concerning brokerage fees. This is the only allegation that states a claim upon which relief may be granted.

SO ORDERED.